UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


JOHN T. TALTY,
    - Plaintiff


    v.                                      CIVIL NO. 3:08-CV-997 (CFD) (TPS)


MICHAEL J. ASTRUE,
COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,
    - Defendant


### MAGISTRATE JUDGE'S OPINION

Pursuant to 42 U.S.C. § 405 (g), the plaintiff, John T. Talty, seeks review of the final decision of the defendant, the Commissioner of Social Security ("Commissioner"), denying his application for disability insurance benefits. For the reasons set forth below, the plaintiff's motion to reverse the Commissioner's decision (Dkt. #25) should be GRANTED, the Commissioner's motion to affirm (Dkt. #29) should be DENIED, and the case should be remanded for further development of the record. 28 U.S.C. § 636 (b).

The plaintiff alleges that he became disabled on January 1, 1998, at age 42. After the plaintiff's application for benefits was denied, he requested a hearing before an Administrative Law Judge ("ALJ"). ALJ Roy P. Liberman held a hearing, which consisted of testimony by the plaintiff, on October 31, 2006. (Tr. 441-59) The

1

ALJ then issued a decision on December 19, 2006, finding that the plaintiff was not disabled as of December 31, 2001, which was the last date on which the plaintiff could qualify for disability insurance benefits. (Tr. 12-21)  The Commissioner's Appeals Council denied the plaintiff's request for review of the ALJ's decision on April 22, 2008 (Tr. 5-8), and the plaintiff then filed the present case.

The ALJ must apply a five-step sequential evaluation process to each application for disability benefits.  See 20 C.F.R. §§ 404.1520 & 416.920.  First, the ALJ determines whether the claimant is employed.  If the claimant is unemployed, the ALJ proceeds to the second step to determine whether the claimant has a severe impairment preventing him from working.  If the claimant has a severe impairment, the ALJ proceeds to the third step to determine whether the impairment is equivalent to an impairment listed in 20 C.F.R. pt. 404, subpt. P, App. 1.  If the claimant's impairment meets or equals a listed impairment, the claimant is disabled.  However, if the claimant does not have a listed impairment, the ALJ proceeds to the fourth step to determine whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant cannot perform his past relevant work, the ALJ proceeds to the fifth step to determine whether the claimant can perform any other work available in the national economy in light of the claimant's RFC, age, education, and

work experience.  The claimant is entitled to disability benefits only if he is unable to perform other such work.  The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. . . .  Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).

In the present case, the ALJ determined that the plaintiff was unemployed and that he had the severe impairments of "opioid dependence and alcohol abuse, morbid obesity, and diabetes mellitus." (Tr. 17-19)  The ALJ then determined that the plaintiff did not have an impairment or combination of impairments that met or equaled any of the listed impairments. (Tr. 19)  After examining the plaintiff's RFC, the ALJ found that the plaintiff could not perform his past relevant work as a mover of household goods. (Tr. 19-20)  However, the ALJ found that the plaintiff could perform "a full range of sedentary work," and that he "could make an occupational adjustment to other jobs existing in significant numbers in the national economy." (Tr. 19-21)  The ALJ accordingly

3

determined that the plaintiff was not disabled as of December 31, 2001, which was the last date on which he could qualify for disability insurance benefits.

The plaintiff's first argument concerns two medical opinions rendered by the plaintiff's treating physicians.  In the first opinion, which was an RFC questionnaire issued on October 26, 2006, Dr. Daniel Sheehan reported that the plaintiff was incapable of tolerating even "low stress" jobs and that his pain or other symptoms constantly interfered with the attention and concentration needed to perform even simple work tasks.  (Tr. 415)  Dr. Sheehan also indicated that the plaintiff could sit for less than two hours in an eight-hour workday and stand or walk for less than two hours in the workday.  (Tr. 416)  In Dr. Sheehan's opinion, the plaintiff could only rarely lift less than 10 pounds and could never twist, stoop, crouch, or climb ladders or stairs.  (Tr. 416-17)  Dr. Sheehan indicated that the plaintiff could use his hands to grasp, turn, or twist objects during only 1 percent of an eight-hour workday and that he could not use his arms or fingers at all during the workday.  (Tr. 417)  Dr. Sheehan stated that the plaintiff had suffered from those symptoms and limitations since 1998, but Dr. Sheehan had treated the plaintiff only since February 2006, which was eight months before rendering the opinion.  (Tr. 414, 418)

The ALJ rejected Dr. Sheehan's opinion on the ground that he had treated the plaintiff only since February 2006.  (Tr. 19)

4

Instead, the ALJ accepted the conflicting opinion of Dr. Arthur L. Waldman, who did not treat the plaintiff but assessed his RFC. On May 18, 2005, Dr. Waldman reported that the plaintiff could occasionally lift or carry up to 20 pounds, stand or walk for two hours in an eight-hour workday, sit for six hours in the workday, perform push and pull movements, and occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 180-87) Dr. Waldman wrote that the plaintiff had normal hip and knee joints and normal range of motion of his wrist, elbow, and shoulder joints. (Tr. 187) Dr. Waldman indicated that the plaintiff "appear[ed] to have venous insufficiency in both legs and suffered from venous ulcerations." (Tr. 187)

The second opinion issued by a physician who treated the plaintiff consisted of two notes handwritten by Dr. Walter Pleban. In the first note, which was dated November 16, 2006, Dr. Pleban wrote that the plaintiff had "pain then numbness of his feet for [the] past 10 [years]." (Tr. 425) In the second note, which was dated December 19, 2006, Dr. Pleban informed the plaintiff's attorney of the following: "I am convinced that [the plaintiff] had venous stasis ulcer disease for the past 10 years or more. . . . [U]ndoubtedly his condition prevented him from working in [December] 2001 . . . . I suspect that he was disabled at that time, as he is now. His disability goes back many years, more than 5 [years]." (Tr. 426)

5

The plaintiff did not present Dr. Pleban's opinion to the ALJ, but the plaintiff provided it to the Commissioner's Appeals Council, which rejected it. The Appeals Council noted that Dr. Pleban had failed to provide "treatment notes or any objective medical evidence to support his 'suspicion.'" (Tr. 6) The Appeals Council also explained that when the plaintiff filed his claim for benefits in 2005, he did not identify any medical source as having treated him before 2003. (Tr. 6, 105-12)

Pursuant to 20 C.F.R. §§ 404.1527 (d) and 416.927 (d), the opinion of a physician who has treated or examined the claimant is generally entitled to more weight than the opinion of a physician who has not treated or examined the claimant. However, a treating physician's opinion is not always entitled to controlling weight. The regulations explain that there are several factors to be considered in assigning weight to a medical opinion, such as the length, nature, and extent of the treating relationship and whether the opinion is consistent with the entire record and supported by the evidence.

The magistrate agrees with the Commissioner that the opinions of Dr. Sheehan and Dr. Pleban were rejected for legitimate reasons. The issue was whether the plaintiff was disabled as of December 31, 2001. Dr. Sheehan began treating the plaintiff in February 2006 and failed to provide any support for the statement that the plaintiff suffered from his present symptoms and limitations since 1998. Dr.

6

Pleban similarly did not support his statements in 2006 that the plaintiff had venous stasis ulcer disease as of December 31, 2001. As the Commissioner's Appeals Council pointed out, the plaintiff's application for benefits in 2005 did not report any medical treatment before 2003.  Given the lack of support for the opinions of Dr. Sheehan and Dr. Pleban, and the inconsistency between those opinions and the lack of treatment reported on the plaintiff's application for benefits, the ALJ and the Commissioner's Appeals Council properly conducted their assessments of the opinions of Dr. Sheehan, Dr. Pleban, and Dr. Waldman.

The plaintiff next argues that the ALJ failed to give sufficient weight to other evidence that the plaintiff suffered from ulcers as of December 31, 2001.  The record contains a "history and physical exam form" from Connecticut Counseling Centers, Inc. dated November 21, 1997.  (Tr. 407-408)  In the "general appearance" section, "venous stasis" is written to the left of the word "skin." (Tr. 408)  There is no indication of the severity of that condition, however.  The ALJ did not discuss the "history and physical exam form" at length, but he relied on the opinion of Dr. Waldman, who noted the plaintiff's venous insufficiency and ulcerations.  (Tr. 187)  Despite those conditions, Dr. Waldman's RFC assessment indicated that the plaintiff was able to perform sedentary work. Contrary to the plaintiff's argument, therefore, it appears that the ALJ gave substantial weight to evidence of the plaintiff's ulcers.

The evidence that the ALJ relied on, however, did not indicate that the ulcers prevented the plaintiff from working. As the "history and physical exam form" did not discuss the severity of the plaintiff's ulcers, the ALJ's failure to devote lengthy discussion to that specific form was harmless.

The record also contains a "nursing assessment" from Bridgeport Hospital dated March 12, 2004. (Tr. 368) Under the "medical/surgical history" heading, the nurse wrote that the plaintiff had "ulcers on both legs" for "3 years." (Tr. 368) According to the progress notes attached to the "nursing assessment," the plaintiff "state[d] that roughly 4 years ago, he sustained blunt injury to the shins which resulted in small ulcerations." (Tr. 369) The plaintiff argues that those documents show that he suffered from ulcers as of at least March 12, 2001, which was within the time period when he could qualify for disability insurance benefits.

The ALJ gave little weight to the time periods reported in those documents because they "appear[ed] to be based on the claimant's subjective statements and not on an objective medical record." (Tr. 19) The magistrate notes that the record contains inconsistent progress notes from Bridgeport Hospital on July 20, 2005, stating that the plaintiff had "chronic leg ulcers" for "2 years" (Tr. 380) rather than three or four years. In light of those inconsistencies, the magistrate concludes that it was proper for the

ALJ to give little weight to the time periods reported in the Bridgeport Hospital records. Those records do not establish that the plaintiff's ulcers prevented him from working as of December 31, 2001.

The plaintiff also directs the Court to the December 8, 2006 affidavit of John Martin, the plaintiff's landlord since 1994. (Tr. 143-45) Martin averred that in 2001, the plaintiff "was frequently complaining of pain and numbness in his legs," which were covered with "many open wounds that apparently would not heal." (Tr. 143) Martin further averred: "It was clear to me in 2001 that [the plaintiff] was not only physically unable to work, but was physically unable to function in his everyday activities." (Tr. 144-45) Although the ALJ did not discuss Martin's affidavit, the Commissioner argues that it merely corroborated the plaintiff's testimony at the ALJ hearing and did not contain any new or different information. The Commissioner also notes that Martin is not a physician and his affidavit is not medical evidence. Having reviewed the entire record, the magistrate agrees that the Martin affidavit is cumulative evidence from a non-medical source, and the ALJ's failure to discuss it was harmless.

The plaintiff's next argument is that the ALJ failed to assess the combined effect of the plaintiff's impairments, especially the effect of his morbid obesity on his other impairments. As to the combined effect of the plaintiff's impairments, the ALJ explicitly

9

found that the plaintiff "did not have an impairment or combination of impairments meeting or equaling any of the [listed] impairments . . . ." (Tr. 19)  In determining the plaintiff's RFC, the ALJ stated that he was required to consider "all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (Tr. 20)  In light of those statements in the ALJ's decision, the magistrate's view is that the ALJ properly considered the combined effect of the plaintiff's impairments and did not consider them only in isolation.

   As to the effect of the plaintiff's morbid obesity on his other impairments, the ALJ found that the plaintiff's morbid obesity "would limit his walking and standing ability but not his ability to sit or otherwise use his body, including his hands and arms." (Tr. 20)  The plaintiff argues that the ALJ improperly assumed that morbid obesity affects only walking and standing and that the ALJ should have analyzed the effect of the plaintiff's morbid obesity on his other impairments, particularly diabetes mellitus.  As the Commissioner points out, however, the ALJ relied on the opinion of Dr. Waldman, who noted that the plaintiff weighed 264 pounds at the time of his RFC assessment.  (Tr. 187)  Dr. Waldman also indicated that the plaintiff complained of "heart problems, difficulty breathing, leg numbness, [and] back pain." (Tr. 187)  Dr. Waldman accordingly took the plaintiff's obesity into account when he

considered all of the plaintiff's impairments, and the ALJ relied on Dr. Waldman's opinion. Although the plaintiff weighed over 400 pounds on April 15, 1998 (Tr. 403), the record lacks medical evidence regarding the impact of the additional weight. The plaintiff has not identified any evidence in the record that would challenge the ALJ's finding that the plaintiff's morbid obesity did not prevent him from sitting and using his hands and arms as of December 31, 2001.

The plaintiff next challenges the ALJ's finding that his subjective complaints of pain were not credible. The ALJ noted that "the [plaintiff's] memory was very vague as to details of the relevant period from the alleged onset date of January 1, 1998, to . . . December 31, 2001 . . . ." (Tr. 17) The ALJ then found that "[t]he [plaintiff's] credibility is seriously at issue in light of his past substance abuse and his current inability to remember details . . . . Accordingly, in summary, we have a former drug abuser who was smoking despite claims of a pulmonary condition and who also was able, years after [December 31, 2001], to spend extended periods of time away from home gambling at casinos." (Tr. 20) The plaintiff argues that the ALJ should have considered the following information in assessing his credibility: (1) The plaintiff began receiving substance abuse treatment in 1997; (2) Dr. Sheehan reported in 2006 that the plaintiff had problems with attention and concentration, so it is reasonable to conclude that

11

those problems would negatively impact his memory; (3) the plaintiff's pulmonary condition may have been related to his obesity rather than smoking, which is addictive; and (4) although the plaintiff "has been known to frequent" casinos, his trips were not of "extended" duration.  (Pl.'s Mem., Dkt. #25, p. 43 n.183)

Credibility determinations are entrusted to the ALJ because the ALJ has the opportunity to observe the demeanor of the witness. Carroll v. Sec'y of Health & Human Services, 705 F.2d 638, 642 (2d Cir. 1983).  In the present case, the ALJ explained that he did not find the plaintiff credible on the basis of his past drug abuse, memory problems, continued smoking despite a pulmonary condition, and his ability to travel to casinos for gambling.  Although the plaintiff sought treatment for his drug abuse, and there may be explanations for his memory problems and pulmonary condition, the plaintiff was nonetheless a past drug abuser with memory problems, and he continued to smoke despite a pulmonary condition.  Although the duration of the plaintiff's trips to casinos may be unclear, he nonetheless was able to take those trips despite his claims of pain. The magistrate concludes that the ALJ properly conducted his assessment of the plaintiff's credibility.

The plaintiff also argues that the ALJ should have called a vocational witness rather than rely on the Medical-Vocational Guidelines ("the grids") when he determined that the plaintiff could perform sedentary work.  See 20 C.F.R. pt. 404, subpt. P, App. 2,

§ 200.00 et seq. The ALJ may rely on the grids rather than a vocational witness if the claimant's non-exertional limitations do not significantly limit the work he can perform given his exertional limitations. See Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986). In the present case, the ALJ found that the plaintiff had only exertional limitations. The plaintiff does not challenge that finding. Therefore, it was proper for the ALJ to rely on the grids instead of a vocational witness.

The plaintiff's next argument is that the ALJ failed to consider the impact of the plaintiff's separate application for supplemental security income on his application for disability insurance benefits. The ALJ acknowledged that the plaintiff's application for supplemental security income had been approved on a finding of disability and that he was entitled to receive that income beginning on December 2, 2005. (Tr. 15, 446) However, the ALJ explained that the "severe and disabling impairments" that qualified the plaintiff for supplemental security income arose long after December 31, 2001, which was the last day he could qualify for disability insurance benefits. (Tr. 18) The ALJ distinguished the "rather extensive medical record" after December 31, 2001 from the "almost non-existent" medical record relating to the relevant time period of 1998 through 2001. (Tr. 18) The magistrate agrees with the ALJ that the disability finding that qualified the plaintiff for supplemental security income did not shed light on the relevant

13

issue, which was whether the plaintiff was disabled as of December 31, 2001.

The plaintiff's last argument is that the ALJ failed to develop the record with respect to the plaintiff's methadone treatment program at Connecticut Counseling Centers, Inc.  The plaintiff directs the Court to a "substance abuse evaluation" completed on December 2, 1997.  (Tr. 409-13)  The "recommendation for treatment" states in relevant part:  "Client should do well on the program.  He claims to be looking forward to groups and individual therapy."  (Tr. 413)  The plaintiff points out that the record lacks further documentation of his participation in therapy and that the documentation of his receipt of methadone is incomplete.  The Commissioner argues that the attorney who represented the plaintiff at the ALJ hearing assumed responsibility for obtaining the missing documentation and then failed to follow through, so the ALJ should not be faulted for the absence of the documentation, if it even exists.

"Even when a claimant is represented by counsel . . . the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  As the ALJ noted in the present case, "the evidence for the period prior to [December 31, 2001] is sparse . . . ."  (Tr. 20)  In light of that sparseness,

14

if additional documentation relating to the plaintiff's methadone treatment program exists, it could possibly influence the ALJ's credibility finding.  Therefore, the magistrate believes that the case should be remanded for the limited purpose of developing the record regarding the plaintiff's methadone treatment program.  If further documentation of that program exists, the ALJ should then consider whether that documentation has any impact on his prior decision.  The plaintiff should have an opportunity to explore the possibility that additional evidence exists.

Accordingly, the court recommends that the plaintiff's motion to reverse (Dkt. #25) be GRANTED, the Commissioner's motion to affirm (Dkt. #29) be DENIED, and the case be remanded for the limited purpose of developing the record regarding the plaintiff's methadone treatment program.  Either party may timely seek review of this recommended ruling in accordance with Rule 72 (b) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 72 (b).  Failure to do so may bar further review.  28 U.S.C. § 636 (b)(1)(B); <u>Small v. Sec'y of Health and Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).
**IT IS SO ORDERED.**

**Dated at Hartford, Connecticut, this 5th day of May, 2010.**


<u>/s/ Thomas P. Smith</u>
**Thomas P. Smith**
**United States Magistrate Judge**